# United States Court of Appeals for the Federal Circuit

---

**DARBY DEVELOPMENT COMPANY, INC., ET AL.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-1929

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01621-AOB, Judge Armando O. Bonilla.

---

Decided:  August 7, 2024

---

CREIGHTON REID MAGID, Dorsey &  Whitney LLP, Washington, DC, argued for plaintiffs-appellants.  Also represented by SHAWN LARSEN-BRIGHT, Seattle, WA.

NATHANAEL YALE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, LOREN MISHA PREHEIM.

LELA AMES, Womble Bond Dickinson (US) LLP, Washington, DC, for amicus curiae National Association of Home Builders.  Also represented by JASMINE CHALASHTORI.

BRETT SHUMATE, Jones Day, Washington, DC, for amicus curiae National Association of Realtors. Also represented by BRINTON LUCAS.

GREGORY DOLIN, New Civil Liberties Alliance, Washington, DC, for amicus curiae New Civil Liberties Alliance.

_____

Before DYK, PROST, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* PROST.

Dissenting opinion filed by *Circuit Judge* DYK.

PROST, *Circuit Judge*.

In September 2020, the Centers for Disease Control and Prevention ("CDC") responded to the COVID-19 pandemic by issuing a nationwide order temporarily halting residential evictions. This eviction moratorium (or iterations of it) remained generally effective for nearly a year.

Owners of residential rental properties sued the government in the U.S. Court of Federal Claims, claiming that the CDC's order constituted a physical taking of their property for public use, thus requiring just compensation under the Fifth Amendment's Takings Clause. The Court of Federal Claims dismissed their complaint for failing to state a claim upon which relief could be granted. Because we conclude that the complaint stated a claim for a physical taking, we reverse and remand for further proceedings.

BACKGROUND

I

The COVID-19 pandemic prompted several legislative and executive responses.

On March 27, 2020, Congress enacted the CARES Act, which instituted a 120-day moratorium on commencing

eviction proceedings for nonpayment of rent as to certain properties that received federal assistance or had federally backed loans. Pub. L. No. 116-136, sec. 4024(b), 134 Stat. 281, 493–94 (2020). That moratorium expired on July 24, 2020.

On August 8, 2020, the President issued Executive Order 13945, titled "Fighting the Spread of COVID-19 by Providing Assistance to Renters and Homeowners." 85 Fed. Reg. 49935 (Aug. 8, 2020). It stated: "[T]he policy of the United States [is] to minimize, to the greatest extent possible, residential evictions and foreclosures during the ongoing COVID-19 national emergency." *Id.* at 49936. It also directed the Secretary of Health and Human Services and the CDC Director to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary to prevent the further spread of COVID-19 from one State or possession into any other State or possession." *Id.*

Less than a month later, on September 4, 2020, the CDC issued an order titled "Temporary Halt in Residential Evictions [t]o Prevent the Further Spread of COVID-19." 85 Fed. Reg. 55292 (Sept. 4, 2020) ("Order"). The CDC represented that it was issuing the Order under the authority of section 361 of the Public Health Service Act ("PHSA")[1] (codified as amended at 42 U.S.C. § 264) as well as 42 C.F.R. § 70.2. *Id.* at 55292–93, 55297. The Order provided that

> a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any State or U.S. territory in which there are documented cases of

---

[1]    Pub. L. No. 78-410, sec. 361, 58 Stat. 682, 703–04 (1944).

> COVID-19 that provides a level of public-health protections below the requirements listed in this Order.

*Id.* at 55296.  The Order did not relieve tenants of their obligation to pay rent.  *Id.* at 55294.  And the government represents that the Order also did not prevent landlords from *commencing* eviction proceedings for nonpayment of rent. Appellee's Br. 7 & n.3 (citing J.A. 42).  The Order did, however, prevent any *actual* eviction for nonpayment of rent from occurring.  *See* 85 Fed. Reg. at 55293 (defining "Evict" and "Eviction"), 55294 (preventing evictions for violations of contractual obligations concerning "timely payment of rent or similar housing-related payment").[2]  The Order was originally set to expire on December 31, 2020. *See id.* at 55297.

On December 27, 2020—just days before the Order was set to expire—Congress extended it by a month, through January 31, 2021.  Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N, sec. 502, 134 Stat. 1182, 2078–79.  In the preceding section of that same Act, Congress also appropriated $25 billion in emergency rental assistance, including for payment of rent and rental arrears. *Id.* sec. 501(a)(1), 501(c)(2), 134 Stat. at 2069–73.  Such

---

[2]    The Order did not prevent evictions for certain reasons unrelated to rent, such as engaging in criminal activity on the premises or threatening the health and safety of other residents.  *Id.* at 55294.  The Order also prevented evictions only if the tenant was a "[c]overed person," which, as defined, generally meant someone who supplied a sworn declaration attesting to economic hardship.  *See id.* at 55293.  Neither side has suggested that this latter qualification should affect our analysis of the legal issues that we decide in this appeal.  Therefore, and for simplicity's sake, we will refer to the Order generally as having prevented evictions for nonpayment of rent.

payments were ultimately intended for lessors. *See id.* sec. 501(c)(2)(C), 134 Stat. at 2073. Less than three months later, Congress appropriated an additional $21.55 billion in emergency rental assistance. American Rescue Plan Act of 2021, Pub. L. No. 117-2, sec. 3201, 135 Stat. 4, 54–58.

As the congressional extension of the Order lapsed, the CDC itself (now under a different administration) extended it. 86 Fed. Reg. 8020 (Feb. 3, 2021) (extending through March 31, 2021). It did so again a few more times, ultimately through October 3, 2021. 86 Fed. Reg. 16731 (Mar. 31, 2021) (extending through June 30, 2021); 86 Fed. Reg. 34010 (June 28, 2021) (extending through July 31, 2021); 86 Fed. Reg. 43244 (Aug. 6, 2021) (extending through October 3, 2021).[3]

## II

Rental-property owners challenged the Order almost as soon as it issued. One litigation—*Alabama Association of Realtors*—culminated in a Supreme Court opinion relevant here.

In *Alabama Association of Realtors*, the plaintiffs contended that the Order exceeded the CDC's statutory authority under the PHSA, thus violating the Administrative Procedure Act. Over the government's opposition, the district court agreed with the plaintiffs and therefore vacated the Order. But, instead of letting the vacatur take effect immediately, the district court granted the government's request to stay that result pending appeal.

In August 2021, the Supreme Court vacated the district court's stay, thus allowing the Order's vacatur to take

---

[3]   Although these extensions included some modifications to the originally issued Order, they are immaterial to this opinion's discussion.

effect. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021). The merits issue of whether the CDC exceeded its PHSA statutory authority was not directly before the Court—only the stay was. But, because a stay's appropriateness generally depends on whether the stay-seeking party has made a strong showing that it will likely succeed on the merits, *see id.* at 761–63 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)), the Court spoke to the merits issue in that context. And, in the Court's view, it was the *plaintiffs*—not the stay-seeking government—who had a substantial likelihood of success on the merits. *Id.* at 759 (deeming the plaintiffs "virtually certain to succeed" on the statutory-authority issue); *id.* at 762–65. Further, when evaluating the equities of a stay, the Court observed that "preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Id.* at 765 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)).

With the stay no longer in place, the district court's vacatur of the Order took effect, and the government voluntarily dismissed its appeal.

## III

Appellants filed this suit against the government in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. In their operative complaint, they claimed that the Order, by preventing them from evicting non-rent-paying tenants, constituted a physical taking of their rental properties for public use, thus requiring just compensation under the Fifth Amendment's Takings Clause. *See* J.A. 37 ¶ 31, 38 ¶¶ 36–37 (describing the Order as having deprived Appellants of their "fundamental right to exclude" and having "effected a government-authorized physical invasion,

occupation, or appropriation of [their] private property, for the government itself or for third parties" (cleaned up)).[4]

The government moved under Court of Federal Claims Rule 12(b)(6) to dismiss Appellants' complaint for failing to state a claim upon which relief could be granted. The government made two primary arguments relevant here. First, it argued that a takings claim cannot be premised on government action that was unauthorized; and, in its view, the Supreme Court in *Alabama Association of Realtors* essentially confirmed that the Order was unauthorized. Second, it argued that, under *Yee v. City of Escondido*, 503 U.S. 519 (1992), the Order could not constitute a physical taking because it merely regulated the landlord-tenant relationship.

The Court of Federal Claims granted the government's motion and dismissed the complaint. *Darby Dev. Co. v. United States*, 160 Fed. Cl. 45 (2022). It agreed with the government's first argument and therefore dismissed without considering the second. *See id.* at 51–56. Notably, it rejected Appellants' arguments that Congress, by extending the Order for a month, had "ratified" the CDC's assertion of legal authority for the Order (or that Congress had otherwise "acquiesce[d]" in that assertion). *See id.* at 54–55, 55 n.12. In addition to analyzing and rejecting these arguments on their merits, the court reasoned that

_____

[4]  Appellants alternatively claimed that the Order constituted an illegal exaction. The Court of Federal Claims dismissed that claim, and Appellants appealed that dismissal. At oral argument, however, Appellants represented that if we reversed the dismissal of the takings claim (which we do), we need not reach the dismissal of the illegal-exaction claim. Oral Arg. at 39:34–40:01, https://oralarguments.cafc.uscourts.gov/default.aspx?fl= 22-1929_09072023.mp3. We therefore do not reach the dismissal of the illegal-exaction claim.

accepting them would be inconsistent with the Supreme Court's ruling in *Alabama Association of Realtors. See id.* at 54–55.

Appellants timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review de novo the Court of Federal Claims' Rule 12(b)(6) dismissal of a complaint for failure to state a claim. *E.g.*, *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013). In doing so, we accept well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See id.*

The Fifth Amendment's Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. This constitutional guarantee "was designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960) (cleaned up).

Appellants' position is straightforward. They claim that the Order, by imposing an eviction moratorium preventing them from evicting non-rent-paying tenants, constituted a physical taking of their rental properties for public use, thus requiring just compensation under the Fifth Amendment's Takings Clause.

The government responds with the same two arguments described above: that the Order cannot support a takings claim because it was unauthorized; and that, under *Yee*, it could not constitute a physical taking because it merely regulated the landlord-tenant relationship. We address each issue in turn.

I

A

"A compensable taking arises only if the government action in question is authorized." *Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998). Two cases in particular—*Del-Rio* (from this court) and *Ramirez* (from the D.C. Circuit)—explain what it means for a government agent's action to be "authorized" in this context. *See Del-Rio*, 146 F.3d at 1362–63; *Ramirez de Arellano v. Weinberger*, 724 F.2d 143, 151–53 (D.C. Cir. 1983) (Scalia, J.).[5]

In the takings context, "authorized" is not synonymous with "lawful" or "done with legal authority." That is, an action can be authorized for takings-claim purposes even if it is unlawful or done without legal authority. *See, e.g.*, *Ramirez*, 724 F.2d at 151 ("It is well established that the mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes, even though he is not 'authorized' to break the law."); *Del-Rio*, 146 F.3d at 1362 (discussing "'authorized' *as that term is used in the law of takings*," and noting that "[m]erely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is

---

[5]    Although the en banc D.C. Circuit vacated the panel's opinion and judgment in *Ramirez*, we have observed that "the en banc court did not disagree with the panel's analysis of the authorization issue." *Del-Rio*, 146 F.3d at 1363 (citing *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1523–24 (D.C. Cir. 1984) (en banc), *vacated on other grounds*, 471 U.S. 1113 (1985)). We therefore continue to find the *Ramirez* panel's discussion of the authorization issue instructive—just as we did in *Del-Rio*. *See id.* at 1362–63.

later determined to have been contrary to law" (emphasis added)). Indeed, then-Judge Scalia—writing for a panel of the D.C. Circuit—characterized as "extreme" the position that "the Tucker Act precludes recovery for acts by government agents beyond their statutory or constitutional authority." *Ramirez*, 724 F.2d at 151.[6]

Instead of asking merely whether the action was legally authorized, the takings-law inquiry asks "whether the alleged invasion of property rights is *chargeable to the government*." *Del-Rio*, 146 F.3d at 1362 (emphasis added). The focus is on whether the government should be held liable for its agents' actions. *See, e.g.*, *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 330 (1922) (Holmes, J.) (considering whether the plaintiffs could "establish authority on the part of those who did the acts to bind the government by taking the land" (cleaned up)); *United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330, 334 (1920) ("What [the government agent] had done[,] . . . having been without authority, . . . created no liability on the part of the government."); *Hooe v. United States*, 218 U.S. 322, 335 (1910) (addressing circumstances under which a government agent "will not, in any legal or constitutional sense, represent the United States," and

---

[6]    We will assume in this opinion that the Order exceeded the CDC's statutory authority under the PHSA. Although Appellants correctly observe that the Supreme Court in *Alabama Association of Realtors* did not *directly* rule on that merits issue (having instead considered it only in the context of ruling on the stay), we find it difficult to ignore the Court's clearly expressed view of that issue. So, while we appreciate the distinction Appellants observe, we will still assume that the Order exceeded the CDC's statutory authority. Again, however, as we explain, an action can be "authorized" in the takings context even if it was done without such authority.

noting that "what he does or omits to do, without the authority of the Congress, cannot create a claim against the government"); *see also Ramirez*, 724 F.2d at 151 (roughly analogizing the inquiry to respondeat superior, a private-law doctrine concerning an employer's liability for actions of its employees).[7]

Certain considerations help separate authorized actions from unauthorized ones in the takings context. *See, e.g.*, *Ramirez*, 724 F.2d at 151–53 (synthesizing case law).

An action will normally be deemed authorized if it was done by government agents "within the general scope of their duties"—i.e., if it was "a natural consequence of congressionally approved measures" or "pursuant to the good faith implementation of a congressional act." *Del-Rio*, 146 F.3d at 1362 (cleaned up); *see also Ramirez*, 724 F.2d at 152 ("[O]n numerous occasions when the government agent was acting within the ordinary scope of responsibilities conferred on him by Congress, and took private property without express statutory authority or prohibition, the Tucker Act remedy was held to lie.").

---

[7]    In determining when an agent's act is attributable to a principal, it is not novel to define the agent's authority based on its reasonable (even if ultimately mistaken) understanding of the authority that the principal gave it. *See, e.g.*, Restatement (Third) of Agency § 2.02 cmt. c (Am. Law. Inst. 2006) ("Actual authority is an agent's power to affect the principal's legal relations in accord with the agent's reasonable understanding, at the time the agent acts, of the principal's manifestations to the agent. . . . *If an agent's understanding is reasonable, the agent has actual authority to act in accordance with the understanding, although the principal subsequently establishes that the agent was mistaken.*" (emphasis added)).

Precedent bears this out.  For example, in *Great Falls*, Congress had authorized the Secretary of War to take land embraced within a survey for purposes of constructing a dam.  The plaintiff alleged that the Secretary took land outside the survey.  The Supreme Court held that even if some of the land taken "happen[ed] not to be covered by the survey . . . , the United States [was] as much bound to make just compensation therefor as if such land[] had been actually embraced in that survey." *Great Falls Mfg. Co. v. Garland*, 124 U.S. 581, 597 (1888).  To be sure, the Court was *not* "saying that the Secretary of War could, by *any* act of his, bind the United States to pay for land[] taken by him" that was unrelated to the dam's construction. *Id.* (emphasis added) (cleaned up).  In the case before it, however, nothing suggested that the Secretary of War had taken more than was "reasonably necessary for the purposes described in the Act of Congress, or that he did not honestly and reasonably exercise the discretion with which he was invested." *Id.* (cleaned up); *see also Ramirez*, 724 F.2d at 153 (discussing *Great Falls*).

In *Portsmouth*, the plaintiffs alleged that the government took their land by firing guns over it from a nearby fort.  The Court of Claims dismissed the takings claim at the pleadings stage.  In reversing the dismissal, the Supreme Court addressed the authorization issue, acknowledging that "it very well may be that the [plaintiffs] will be unable to establish authority on the part of those who did the acts to bind the government by taking the land." 260 U.S. at 330 (cleaned up).  But, given the plaintiffs' allegations, the Court was unprepared to conclude at the pleadings stage that the government agents in question lacked that authority.  After all, the Court noted, "as the United States built the fort and put in the guns and the men, there is a little natural unwillingness to find lack of authority to do the acts even if the possible legal consequences were unforeseen." *Id.*

In *Eyherabide*, the plaintiffs owned property near a military gunnery range used for testing aerial ordnance. Although the military had previously been a lessee of the property, its lease had ended in 1947. *Eyherabide v. United States*, 345 F.2d 565, 567 (Ct. Cl. 1965). Sometime after 1952, military personnel were dropping fuel tanks, shells, and other objects on or near the property. *See id.* at 568–69. Military personnel even visited the property several times and warned its caretakers that they were trespassers and that they should leave or else be arrested. *Id.* at 568. The plaintiffs brought a takings claim. Our predecessor court addressed the authorization issue and concluded that, because the government agents were acting within the "general scope of [their] duties," their actions were not "wholly unauthorized"—even though "they may have been mistaken, imprudent, or wrongful." *Id.* at 570. The court added that "[n]o statute or regulation *forbade* these activities." *Id.* (emphasis added).

Finally, in *Del-Rio* itself, an agency responsible for issuing drilling permits had denied a permit due to its misinterpretation of a statute.[8] We held that, even if the denial had been unlawful, it was still authorized for takings-claim purposes because "[i]t was part of [the agents'] job to interpret the statutes and regulations governing federal mining leases, and there [was] no reason to suppose that their decision reflected anything but a good faith effort to apply the statutes and regulations as they understood

---

[8] Technically, and contrary to the government's characterization, this court in *Del-Rio* never held that the agency had "mistakenly interpreted the statute." *Contra* Appellee's Br. 24. We instead held that whether it had done so was immaterial to the takings claim's viability. *See Del-Rio*, 146 F.3d at 1363–64. Nevertheless, for the purposes of our discussion, we will assume that the agency did indeed misinterpret the statute.

them." *Del-Rio*, 146 F.3d at 1363. "In short," we said, the agents "had the authority to regulate the proposed mining." *Id.* (cleaned up).

In contrast, unauthorized actions for takings-claim purposes tend to be "outside the normal scope of the government officials' duties" or done despite an "explicit prohibit[ion]."[9] *See id.*; *see also Ramirez*, 724 F.2d at 151 (observing that, if a taking occurs while a government agent "is acting within the normal scope of his duties," it will typically be deemed authorized "*unless Congress has expressed a positive intent* to prevent the taking or to exclude governmental liability" (emphasis added)).

Precedent bears this out as well. In *Hooe*, for example, a government agency was leasing a building (except for the basement) for $4,000 annually, yet the agency proceeded to occupy the basement anyway. 218 U.S. at 327. The lessors balked at renewing the lease for $4,000, wanting $6,000 instead (to include the basement). *Id.* at 327–28. Although Congress initially refused to increase the appropriation

---

[9]    The *Del-Rio* court described each of these as a defining characteristic of actions done "ultra vires," *id.* (italics removed), and it contrasted ultra vires actions with those that are "chargeable to the government" (and thus capable of supporting takings liability), *id.* at 1362. We recognize that, in *City of Arlington*, the Supreme Court viewed "ultra vires" agency action more generally as anything going "beyond what Congress has permitted it to do." *See City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013). We think it clear, however, that the *Del-Rio* court was using the term in a narrower sense, given that it said repeatedly that just because an action is unlawful does not mean it is unauthorized for takings-claim purposes. *E.g.*, 146 F.3d at 1363; *see also* Appellee's Br. 27 (referencing "ultra vires conduct *as that term is used in Del-Rio*" (emphasis added) (some italics removed)).

above $4,000, it later appropriated $4,500. *Id.* at 328. In doing so, Congress "distinctly advised" the plaintiffs that this amount was all that it was authorizing for the building's rent. *Id.* at 332 (citing relevant appropriation acts specifying that the amount appropriated for the rent was intended to be "*full* compensation" (emphasis in original)); *see also id.* at 331 (collecting background statutes generally prohibiting government agencies from making contracts for rent until an appropriation had been made). The Secretary of the Interior then reached agreement to lease the building (except for the basement) for $4,500, *id.* at 328–29, but the agency nonetheless continued to occupy the basement. When the lessors filed suit to recover the difference between what they were paid and what they believed they were owed (including for the continued occupation of the basement), the Supreme Court held that they could not recover because, under the circumstances, the government agents had no authority to bind the government for anything more than what Congress had appropriated for rent. *See id.* at 333–36. Notably, the Court later distinguished *Hooe* from other takings cases on the ground that it involved "specific limitation on the agent's authority." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 701 n.24 (1949); *see Ramirez*, 724 F.2d at 151 (observing as much); *see also United States v. Buffalo Pitts Co.*, 234 U.S. 228, 235 (1914) (distinguishing *Hooe* because "the attempt to make the government liable for rent was in the face of a statute . . . [that] provided that no contract should be made for rent until an appropriation for that purpose had been made by Congress").[10]

---

[10]     This court's predecessor distinguished *Hooe* on a similar basis. *See Armijo v. United States*, 663 F.2d 90, 96 (Ct. Cl. 1981) (characterizing *Hooe* as holding that takings liability "could not be founded on the acts of officers wholly without authority from Congress, express or implied, the

The Supreme Court also deemed action unauthorized in *North American Transportation*. There, an army general had taken possession of the plaintiff's property. 253 U.S. at 332. Although Congress had authorized such an appropriation, that authority had been conferred *only* upon the Secretary of War. *See id.* at 333–34. And while the Secretary did later authorize the appropriation, "[w]hat [the army general] had done before that date[,] having been without authority, . . . created no liability on the part of the government." *Id.* at 334; *see also Ramirez*, 724 F.2d at 151 & n.9 (discussing *North American Transportation* and characterizing the army general's action as "not compensable under the Tucker Act since the applicable statute had explicitly conferred confiscation power only upon the Secretary of War").

\*    \*    \*

To summarize: even if an action by a government agent is unlawful, it will likely be deemed authorized for takings-claim purposes if it was done within the normal scope of the agent's duties—for example, if it was done "pursuant to the good faith implementation of a congressional act." *Del-Rio*, 146 F.3d at 1362 (cleaned up). If instead the action was outside the normal scope of the government agent's duties—or, despite being within that scope, it contravened an explicit prohibition or other positively expressed congressional intent—it will likely be deemed unauthorized. *See id.* at 1363; *Ramirez*, 724 F.2d at 151. The ultimate inquiry is whether the government agent's action is "chargeable to the government." *Del-Rio*, 146 F.3d at 1362.

_____

implication being to the contrary *in view of the express rental limit*" (emphasis added)).

B

We now consider whether the Order was "authorized" in the way takings law contemplates.  We conclude that it was.[11]

To begin, we conclude that the CDC was acting within the normal scope of its duties when it issued the Order.  The CDC is a national public-health agency, and its Director is authorized under section 361 of the PHSA "to make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases . . . from one State or possession into any other State or possession."  42 U.S.C. § 264(a).[12]  The CDC issued the Order explicitly under that statutory authority.  85 Fed. Reg. at 55292–93, 55297.  The Order explained why evictions would increase the risk of spread.  *Id.* at 55296 ("In short, evictions threaten to increase the spread of COVID-19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters.").  And it determined that the eviction moratorium "constitute[d] a reasonably necessary measure . . . to prevent the further spread of COVID-19 throughout the United States."  *Id.*  Plainly, when the CDC issued the Order, it was trying to "prevent the . . . spread of communicable diseases" across states—one of its core functions under the PHSA.  *See* 42 U.S.C. § 264(a).

Critically, we also conclude that the CDC issued the Order "pursuant to the good faith implementation of" the

---

[11]    Neither side has suggested that any factual dispute or other reason here prevents us from resolving this issue as a matter of law at this stage.

[12]    The PHSA named the Surgeon General when setting forth this authority, but it is undisputed that the relevant authority now lies with the CDC Director.

PHSA. *See Del-Rio*, 146 F.3d at 1362 (cleaned up). The government certainly does not suggest otherwise. *See* Oral Arg. at 29:18–29. Nor could it, really. After all, the government spent months in litigation defending its Order-related interpretation of the PHSA. *See, e.g.*, Mot. Summ. J. at 8, *Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 1:20-cv-03377 (D.D.C. Dec. 21, 2020) ("[The] CDC acted within its statutory and regulatory authority in issuing the Order. This issue is one of straightforward statutory analysis . . . ."), ECF No. 26. And, although the Supreme Court eventually rejected that interpretation, it was hardly an unfounded one; other courts (and three dissenting Justices) deemed it meritorious. *See, e.g.*, *Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 21-5093, 2021 WL 2221646, at *1–2 (D.C. Cir. June 2, 2021); *see also Ala. Ass'n of Realtors*, 594 U.S. at 768–70 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting); *id.* at 770 ("At minimum, there are arguments on both sides."). On the whole, the circumstances here indicate that the CDC issued the Order in a good-faith attempt to prevent interstate spread of COVID-19, based on a good-faith interpretation of its authority under the PHSA. This suffices to conclude that the CDC issued the Order within the normal scope of its duties for takings-claim purposes. *See Del-Rio*, 146 F.3d at 1362.

Having concluded that the CDC issued the Order within the normal scope of its duties, we next consider whether it contravened some explicit prohibition or positively expressed congressional intent in so doing. *See id.* at 1363, *Ramirez*, 724 F.2d at 151. We conclude it did not. The government, for its part, does not identify any relevant explicit prohibition or intent—whether in the PHSA or otherwise. And the circumstances here, in addition to confirming there was *not* one, further suggest that any taking resulting from the Order should be deemed chargeable to the government. For example, unlike other takings cases deciding the authorization issue (involving localized

interests regarding one property owner or another), here the Order was of vast national significance and impacted property owners nationwide—all in a time of national distress.[13] It hardly escaped Congress's attention. And yet, not only did this all play out under Congress's watchful eye without eliciting any legislative pushback, Congress actually *extended* the Order by a month. Consolidated Appropriations Act, 2021 div. N, sec. 502, 134 Stat. at 2078–79 (further describing the Order as issued "under section 361 of the [PHSA] (42 U.S.C. [§] 264)"). While we do not dispute

---

[13]     We note that, although *Youngstown* involved an issue of national significance and impact—namely, the President's seizure of most of the nation's steel mills in response to a threatened labor strike—the Supreme Court in *Youngstown* did not decide the takings-claim-authorization issue. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584–85 (1952). Instead, it simply acknowledged the issue when assessing whether, on prudential grounds, it should decline to reach the *constitutional* issue implicated by the district court's injunction. The theory behind the prudential ground was: if the steel mills had an adequate remedy in takings liability, an injunction might have been denied on that basis without having to confront the constitutional issue. *See id.* In assessing that prudential ground, the Court noted only that some of its prior cases "cast doubt" on a plaintiff's ability to establish takings liability for "propert[y] unlawfully taken." *Id.* at 585 (citing *Hooe* and *North American Transportation*). It also reasoned that damages for the alleged taking would be "difficult, if not incapable, of measurement." *Id.* "Viewing the case this way, and in the light of the facts presented," the Court agreed with the district court that there was "no reason for delaying decision of the constitutional validity" of the President's seizure. *Id.* And it ultimately affirmed the injunction because it concluded that the President's seizure was indeed unconstitutional. *See id.* at 587–89.

the Court of Federal Claims' conclusion that Congress did not necessarily ratify or acquiesce in the CDC's assertion of *legal* authority for the Order, *see, e.g.*, *supra* note 6, we do think Congress's role respecting the Order additionally supports the conclusion that any taking resulting therefrom is fairly chargeable to the government.  At the very least, it dispels any notion that there was some explicit congressional *prohibition* (or something to similar effect) that the Order contravened.[14]

Accordingly, because the CDC issued the Order within the normal scope of its duties, and because it did not contravene any explicit prohibition or positively expressed congressional intent in so doing (far from it, as just discussed), we conclude that the Order was "authorized" for takings-claim purposes.  *See Del-Rio*, 146 F.3d at 1362–63; *Ramirez*, 724 F.2d at 151–53.

That the Order was "authorized," or chargeable to the government, not only accords with doctrine; it also accords with common sense.  The CDC issued the Order only after receiving a directive—from the President himself—to "consider whether any measures temporarily halting residential evictions of any tenants for failure to pay rent are reasonably necessary to prevent" further interstate spread

---

[14]    We reiterate that Congress, in a neighboring section of the Consolidated Appropriations Act, 2021, appropriated $25 billion in emergency rental assistance (ultimately intended for lessors) and another $21.55 billion soon thereafter.  *See supra* Background Part I.  While unnecessary to our decision, we think this contemporaneous action further suggests that Congress appreciated that any taking resulting from the Order would be "chargeable to the government"—in quite a literal sense.  Indeed, had the congressionally appropriated money made its way to otherwise-unpaid lessors, there may have been little to no *uncompensated*-taking allegations to speak of.

of COVID-19. 85 Fed. Reg. at 49936. Just before the Order was set to expire by its own terms, Congress stepped in and extended it. Thereafter, the CDC—now under a different administration—extended it several more times. All the while, the government vehemently defended the Order's legality against challenges. Taken together, these acts show the Order to be a sustained, comprehensive governmental effort bearing hallmarks of official governmental action. Under these circumstances, there is indeed "a little natural unwillingness to find lack of authority" on the CDC's part. *See Portsmouth*, 260 U.S. at 330.

Ultimately, requiring that a government agent's action be "authorized" in order to support takings liability reflects solicitude for Congress's "power of the purse." *See, e.g.*, *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Ct. Cl. 1978). The basic idea is to guard against government agents obligating the public fisc without sufficient say-so from Congress. For the foregoing reasons, we do not believe that concern is implicated by this case. Moreover, any such concern should be assuaged by the fact that Congress has *already* appropriated a significant sum for the purpose of rent or rental arrears, ultimately intended for lessors. *See supra* note 14.

## C

### 1

The dissent and government take a contrary view of the authorization issue. They insist that, because the Order exceeded the CDC's statutory authority under the PHSA, it was unauthorized for takings-claim purposes—no further analysis needed. While they acknowledge that an authorized action can be unlawful in *some* respects, they say there exists a bright-line rule: if the government agent's action exceeds the authority of the statute *under which the agent was acting*, it cannot be authorized in the takings sense. Rather, they maintain, actions of the "unlawful yet authorized" sort contemplate only violations of

some *other* statute, or some (arguably) other miscellaneous type of error (for the dissent, it is a mistake of fact; for the government, it is a mere "procedural[]" error, or perhaps the *way* in which the action was carried out, or maybe even a constitutional violation, like violating the Eighth Amendment). *See, e.g.*, Dissent 1–2; Appellee's Br. 17, 25–27. This type of line-drawing is both unsupported and unpersuasive.

Initially, the dissent marshals several cases that it says support its bright-line rule. The cases it relies on, however, are distinguishable—at least because in those cases, unlike here, the alleged taking contravened an explicit prohibition or other positively expressed congressional intent. For example, in addition to *Hooe* and *North American Transportation* (discussed *supra* Discussion Part I.A), the dissent relies on this court's predecessor's decisions in *NBH* and *Southern California Financial*. Dissent 15–16, 24. In *NBH*, the alleged taking related to a proposed expansion of a military base—a proposal Congress had twice explicitly *rejected*. *NBH*, 576 F.2d at 318. In deeming the requisite authorization lacking, the court repeatedly stressed this latter fact. *Id.* at 319 (observing that "the only participation by Congress has been to reject the acquisition out of hand"); *id.* (reasoning that "awareness" of potential Tucker Act liability "cannot be imputed to Congress when its only connection with a proposed land acquisition has been to reject it").

Likewise, in *Southern California Financial*, the military appropriated what amounted to a fee or permanent easement. Our predecessor court determined that, under the Military Construction Authorization Act, such an appropriation "would have required the specific consent of Congress," which the military neither sought nor obtained. *S. Cal. Fin. Corp. v. United States*, 634 F.2d 521, 523 & n.3 (Ct. Cl. 1980). Central to the court's conclusion that the requisite authority was lacking was the fact that the military had acted *despite* Congress's "*express demand*" that

Congress first "consider and authorize a permanent or indefinite acquisition of this size." *Id.* at 525 (emphasis added). Indeed, this fact "ma[de] all the difference." *Id.*; *see also id.* ("In the face of the express requirement to seek congressional consent in a Military Construction Authorization statute, there can be no implied authority to take a permanent or indefinite interest apart from that route." (cleaned up)); *id.* at 524 ("[A]n executive agency is not authorized to take steps resulting in a compensable taking where Congress has *refused* to authorize such a taking or *properly expects that no such taking can occur unless specified procedures involving Congress are followed.*" (emphasis added)).

Other cases the dissent relies on are to similar effect. *See Coast Indian Cmty. v. United States*, 550 F.2d 639, 650–52, 650 nn.23 & 25 (Ct. Cl. 1977) (one section of the congressional Act appeared to authorize the alleged taking, but a neighboring section of the same Act "expressly forb[ade]" such an action without tribal consent; the alleged taking "in the absence of the required consents was an act beyond the authority of the government agents involved" (cleaned up)); *Sun Oil Co. v. United States*, 572 F.2d 786, 819 (Ct. Cl. 1978) (the congressional Act appeared to authorize the alleged taking, but *only* in "special national emergency or state of war situations," which were not present).[15]

---

[15] The dissent also relies on *Mitchell v. United States*, 267 U.S. 341 (1925), to support its bright-line rule. *See* Dissent 7–8, 24. We think its reliance is misplaced. In *Mitchell*, the Supreme Court primarily held that plaintiffs whose land was taken could not recover consequential damages for the resulting loss to their business. *Id.* at 344–45. The Court additionally reasoned that (1) there was no finding that the government intended to take the business (and that without such intent, there could be no

In each of these cases, Congress had provided some explicit indication that the alleged taking was *not* authorized. As we have explained, those circumstances are not present in this case; if anything, the circumstances here are the opposite. This distinction "makes all the difference." *See S. Cal. Fin.*, 634 F.2d at 525.

The dissent also reads *Del-Rio*, and the principles it articulated, as being limited to the dissent's bright-line rule. *See, e.g.*, Dissent 18–19 (maintaining that *Del-Rio* recognized only that a government agent's action, "though unlawful because violative of *another statute* or *mistaken on the facts*," can be authorized in the takings sense (emphasis added)). We disagree with the dissent's narrow reading of *Del-Rio*. Nowhere does *Del-Rio* itself ascribe significance to such a distinction—e.g., between acts contrary to the

---

takings liability); and (2) there was no finding that the government even took the business. *Id.* at 345. Only after providing these additional reasons did the Court add that, "[m]oreover," because the Act in question did not confer authority to take a business, there could be no takings liability. *Id.* (citing *N. Am. Transp.*, 253 U.S. 330). Even then, however, the Court interpreted language in the Act as demonstrating that Congress *did* authorize accounting for consequential damages from a resulting loss to a business—but only in cases where the property owner and the government reached an agreement on the sale price (as distinct from the case before it, where the property was acquired via eminent domain). *See id.* In other words, with Congress having granted such authority (but only in certain instances), the case resembled *North American Transportation*, the sole case *Mitchell* cited for the takings-claim-authorization issue. Regardless, *Mitchell's* facts and primary holding are not implicated here—which may explain why the government, despite citing the case in its brief, did not discuss it.

statute under which the agent was acting and acts contrary to some *other* statute—let alone indicate that only the latter (and not the former) could support takings liability. Nor do we think such a distinction is dispositive of whether the action should be deemed chargeable to the government. In either scenario, the agent has exceeded its authority in some sense. *See Ramirez*, 724 F.2d at 151 (no agent is "'authorized' to break the law"). And each type of misstep could well arise in the course of an agent's carrying out what it fairly perceives to be its duty, based on what Congress has (and has not) told it. Put simply, the question of authority for takings-claim purposes is different from the question of statutory authority.

Finer legal points aside, the implications of the dissent and government's position illustrate its weakness. Taken to its logical conclusion, their position is that government agents can physically occupy private property for public use, resist for months the owner's legal attempts to make them leave, and then, when finally made to leave, say they need not pay for their stay because they had no business being there in the first place. It would be one thing for this to be the result when government agents are clearly acting apart from Congress's will; in such a case, requiring just compensation would encroach too much on Congress's power of the purse.[16] But there is no sound reason for such a result in a case like this, where (1) the government agent, after receiving a directive from the President, acted in good faith pursuant to a good-faith understanding of its congressionally conferred authority, (2) there was no explicit congressional prohibition foreclosing that understanding (indeed, Congress at the time did nothing but lend support

---

[16]   Moreover, we think that in such a case, the lack of legal authority that would demand ending the occupation would become apparent relatively quickly in any litigation challenging the occupation.

to that understanding), and (3) the government vehemently pressed that understanding in litigation so as to seriously impede the property owners' efforts to end the alleged occupation. Depriving property owners of a potential Fifth Amendment remedy in this case would deprive them of any meaningful remedy at all. It would vitiate the Takings Clause by "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49 (cleaned up). No precedent or good sense compels such a result.

2

The dissent and government further argue that, even if the CDC's lack of PHSA authority for the Order does not *by itself* foreclose a takings claim, the CDC *also* was not acting within the normal scope of its duties when it issued the Order. *See* Dissent 25–31; *see also* Appellee's Br. 27, 35. Both rely heavily on the Supreme Court's ruling in *Alabama Association of Realtors* in advancing this argument. *See, e.g.*, Dissent 31 ("[T]he Supreme Court's decision specifically held that the [Order] was outside the agency's normal scope of duties or any reasonable interpretation of its powers."); Appellee's Br. 27 (observing that the Court deemed it "virtually certain" that the CDC lacked statutory authority for the Order (quoting *Ala. Ass'n of Realtors*, 594 U.S. at 759)).

We are unconvinced. As we have explained, the question of statutory authority is distinct from the question of authority for takings-claim purposes. Only the former was at all implicated in *Alabama Association of Realtors*. And we are unwilling to assume that the Supreme Court, in assessing the merits of the PHSA statutory-authority question, *also* implicitly decided (or even suggested) that the Order was unauthorized in the takings sense—so as to relieve the government of a Fifth Amendment obligation to compensate for any taking that resulted from the Order.

The dissent nonetheless maintains that, because the Order was so abnormal, it could not have possibly been within the "normal scope" of the CDC's duties. *See* Dissent 28 ("[T]he [PHSA] had been in existence for 76 years, but the CDC's [Order] was unlike any previous action taken under the PHSA before the COVID-19 pandemic."); *id.* at 27–30. Of course, when we say that the CDC issued the Order within the "normal scope" of its duties, we do not mean to suggest that the Order *itself* was normal. We readily agree it was not. But then again, neither was a burgeoning pandemic on the scale of COVID-19 (certainly not in the 76 years of the PHSA's existence). *See, e.g.*, 85 Fed. Reg. at 55292 (observing that COVID-19 presented "a historic threat to public health" prompting "unprecedented or exceedingly rare [governmental] actions"). The Order's abnormality flowed naturally from the abnormal circumstances the CDC was confronting—and from the CDC's reasonable (if ultimately incorrect) interpretation and application of its PHSA authority to those circumstances. In this case, simply because the Order was abnormal does not mean that the CDC—the agency charged with issuing regulations "as in [its] judgment" are necessary *to prevent the interstate spread of communicable diseases*, 42 U.S.C. § 264(a)—was acting outside the "normal scope" of its duties for takings-claim purposes when issuing it.

Accordingly, for the foregoing reasons, we conclude that the Order was "authorized" in the way takings law contemplates.

## II

Having concluded that there is no "lack of authorization" impediment to Appellants' takings claim, we turn now to whether their complaint stated a claim for a physical taking by the government. We conclude that it did.

The law recognizes two main categories of takings—physical takings and regulatory takings—each analyzed differently. *See, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v.*

*Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321–23 (2002). Generally speaking, physical takings (which concern physical occupation or appropriation of property) involve per se rules, whereas regulatory takings (which concern restrictions on how a property owner *uses* its property) involve a flexible, multifactor balancing inquiry. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–49 (2021); *Tahoe-Sierra*, 535 U.S. at 321–23. Here, we consider only whether Appellants' complaint stated a claim for a physical taking, as they have expressly disclaimed any regulatory-taking theory. *Darby*, 160 Fed. Cl. at 51 n.9; Appellants' Br. 13; Oral Arg. at 40:00–07.

The parties' dispute over whether the complaint stated a physical-taking claim centers largely on two Supreme Court cases. Appellants rely on *Cedar Point*, and the government relies on *Yee*. We therefore recount these two cases before analyzing the physical-taking issue here.

A

In *Cedar Point*, a state regulation granted labor organizations a right to take access to an employer's property. The regulation required employers to allow union organizers onto their property for up to three hours a day, 120 days a year. 594 U.S. at 143. In analyzing the regulation's takings implications, the Supreme Court observed that the "right to exclude is 'one of the most treasured' rights of property ownership." *Id.* at 149 (quoting *Loretto*, 458 U.S. at 435). And, after canvassing its precedent, it confirmed that "government-authorized invasions of property . . . are physical takings requiring just compensation." *Id.* at 152. The Court determined that the regulation "appropriate[d] a right to physically invade" the employers' property. *Id.*; *see id.* at 149 ("Rather than restraining the [employers'] use of their own property, the regulation appropriate[d] for the enjoyment of third parties the owners' right to exclude."). It therefore constituted a per se physical taking. *Id.* at 152. And such takings are assessed "using a simple,

per se rule: The government must pay for what it takes." *Id.* at 148 (italics removed).

*Yee* involved park owners renting space to mobile-home owners for their mobile homes. As a practical matter, these "mobile" homes stayed put. So, when a mobile-home owner wished to move, the home would be sold in place, and the buyer would continue to rent the space from the park owner. *Yee*, 503 U.S. at 523. At issue were a state statute and a local rent-control ordinance. The statute limited the bases upon which a park owner could terminate a mobile-home owner's tenancy—though, notably, "nonpayment of rent" and "the park owner's desire to change the use of his land" remained permissible bases. *Id.* at 524 (citing Cal. Civ. Code § 798.56 (West 1991)). The ordinance set rent at what the park owners claimed was below market. *Id.* at 524, 526–27. The park owners argued that their mobile-home-owner tenants could take advantage of the below-market rent they paid (and that any future tenant would pay) under the ordinance by selling their home at a premium. That is, these mobile-home owners could convince a prospective buyer that paying extra for the home was worth it, because the buyer would be paying below-market rent. In the park owners' view, their mobile-home-owner tenants could thus reap value that the park owners asserted belonged to them. They claimed that this "transfer[]" to the mobile-home owners constituted a physical taking. *See id.* at 526–27.

The Supreme Court concluded in *Yee* that no physical taking occurred. It observed that "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* at 527 (emphasis in original). That element of required acquiescence was missing, however, because the park owners "voluntarily rented their land to mobile home owners." *Id.* The Court reasoned that "no government ha[d] required any physical invasion of [the park owners'] property"; rather, "[their] tenants were invited by [them], not forced upon

them by the government." *Id.* at 528. Ultimately, the Court concluded that the laws at issue "merely regulate[d] [the park owners'] *use* of their land by regulating the relationship between landlord and tenant," *id.* (emphasis in original), and it confirmed that "[w]hen a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge" without effecting a physical taking, *see id.* at 529. In so concluding, however, the Court was careful to note that (1) nothing compelled the park owners, once they had rented their property to tenants, to continue doing so, *id.* at 527–28; (2) in fact, a park owner wishing to change use of its property could evict its tenants (albeit with six- or twelve-months' notice), *id.* at 528; and (3) "[a] different case would be presented" if a landowner were "compel[led] . . . over objection to rent his property or to refrain in perpetuity from terminating a tenancy," *id.*

## B

*Cedar Point*'s reasoning indicates that the complaint stated a physical-taking claim. And, as explained below, we consider *Yee* distinguishable. We therefore conclude that the complaint stated a physical-taking claim.

We begin with *Cedar Point*. Just as in that case—where, absent the regulation, the employers could have excluded the union organizers from their property, *Cedar Point*, 594 U.S. at 155—here Appellants alleged (and there has been no dispute) that, absent the Order, they could have evicted (or "excluded" from their property) at least some non-rent-paying tenants, *see* J.A. 31 ¶ 10. And, just as the *Cedar Point* regulation resulted in government-authorized physical invasion—having "appropriate[d] for the enjoyment of third parties" the employers' right to exclude, 594 U.S. at 149—here too Appellants alleged that the Order, by removing their ability to evict non-rent-paying tenants, resulted in "government-authorized invasion, occupation, or appropriation" of their property, J.A. 37 ¶ 31

(cleaned up). *See also Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024) (observing that a physical taking occurs if the government physically appropriates property "or otherwise interfere[s] with the owner's right to exclude others from it" (citing *Cedar Point*, 594 U.S. at 149–52)). Moreover, even apart from these significant similarities, at a fundamental level, we cannot reconcile how forcing property owners to occasionally let union organizers on their property infringes their right to exclude, while forcing them to house non-rent-paying tenants (by removing their ability to evict) would not.

*Yee*, meanwhile, is distinguishable and does not control here. Unlike here, the laws at issue in *Yee* expressly *permitted* eviction for nonpayment of rent. *See* 503 U.S. at 524; *see also id.* at 531 n.* (noting that the ordinance "only limits rents"). Indeed, *Yee* was fundamentally a rent-control case. *See id.* at 529–30 (observing that "[o]rdinary rent control often transfers wealth from landlords to tenants," and that although a mobile-home owner's "ability to sell the mobile home at a premium may make this wealth transfer more *visible* than in the ordinary case," "the existence of the transfer in itself d[id] not convert regulation into physical invasion" (emphasis in original)). The gravamen of the park owners' challenge in *Yee* concerned an alleged transfer of value that was occasioned by the rent-control ordinance—a theory that was "predicated on the unusual economic relationship" between park owners and mobile-home owners. *See id.* at 526. The Court simply was not presented with something akin to what has been challenged here: an outright prohibition on evictions for nonpayment of rent.

Although the government advances several *Yee*-based arguments for why Appellants' complaint did not state a physical-taking claim, none is persuasive.

First, the government seems to suggest that *Yee* broadly established that government actions implicating

the landlord-tenant relationship can never be physical takings. *See, e.g.*, Appellee's Br. 17–18. We disagree. To be sure, *Yee* confirmed that states "have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." 503 U.S. at 528–29 (quoting *Loretto*, 458 U.S. at 440); *see also FCC v. Fla. Power Co.*, 480 U.S. 245, 252 (1987) (articulating a similar principle where the FCC was regulating rates that utilities charged to cable companies for attachments on utility poles). But we see nothing in *Yee* (or any other binding precedent we are aware of) that immunizes—as a *categorical* matter—government action implicating the landlord-tenant relationship from being treated as a physical taking. That is particularly so given the express caveat in *Yee* that "[a] different case would be presented" if a landowner were "compel[led] . . . over objection to rent his property or to refrain in perpetuity from terminating a tenancy." 503 U.S. at 528.[17]

Second, the government argues that here, like *Yee* (and unlike *Cedar Point*), Appellants' tenants had been voluntarily "invited" onto Appellants' property—which,

---

[17]    *Florida Power* provides another example of this type of caveat. There, the Supreme Court stated that "statutes regulating the economic relations of landlords and tenants are not per se takings." *Fla. Power*, 480 U.S. at 252 (italics removed) (citing *Loretto*, 458 U.S. at 440). But, even setting aside what was (and was not) specifically contemplated by "economic relations," the statement was hardly unqualified. Earlier in the same paragraph, the Court expressly noted that it was *not* deciding what the physical-taking implications "would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements." *See id.* at 251–52 n.6.

according to the government, means that there was no physical taking. *See* Appellee's Br. 41, 46–47; *see also Yee*, 503 U.S. at 528 (observing that the park owners' "tenants were invited by [them], not forced upon them by the government"). While we agree that this point distinguishes this case from *Cedar Point*, we are not persuaded that it compels a different result. If a previous voluntary invitation (by itself) controlled the analysis, that would essentially mean that *all* government actions implicating the landlord-tenant relationship are immune from being treated as physical takings. (After all, we can safely assume that just about every landlord-tenant relationship stems from a voluntary "invitation" from the landlord to the tenant.) And yet, as noted above, we see no reason why government actions implicating that relationship must be categorically immune from being treated as a physical taking. At bottom, just because tenants (or other occupiers of property) were at one point "invited" does not mean that their continued, government-compelled occupation cannot, under any circumstances, be treated as a physical taking.

Third, the government downplays the significance of *Yee*'s express caveat that "[a] different case would be presented" if a landowner were "compel[led] . . . over objection to rent his property or to refrain *in perpetuity* from terminating a tenancy," 503 U.S. at 528 (emphasis added). Specifically, the government argues that the Order did not prevent evictions *in perpetuity*. *See* Appellee's Br. 43. But the Supreme Court confirmed in *Cedar Point* that even temporary physical appropriations are physical takings. 594 U.S. at 153 ("[W]e have held that a physical appropriation is a taking whether it is permanent or temporary."). The mere fact that the Order did not extend "in perpetuity" therefore does not preclude it from having effected a physical taking.

In sum, the complaint states a claim sharing significant similarities with what was described and held in *Cedar Point* to constitute a physical taking. And, although

*Yee* was concerned with a landlord-tenant relationship, for the foregoing reasons, we find it distinguishable from the circumstances presented in this case. We therefore conclude that Appellants' complaint stated a physical-taking claim requiring just compensation. Our conclusion in this regard is only bolstered by the Supreme Court's observation in *Alabama Association of Realtors* that the Order, by "preventing [landlords] from evicting tenants who breach their leases[,] intrudes on one of the most fundamental elements of property ownership—the right to exclude." 594 U.S. at 765 (citing *Loretto*, 458 U.S. at 435).

Before completing our discussion, however, one final point bears mentioning. The government envisions "striking" implications of concluding that Appellants' complaint stated a physical-taking claim. *See* Appellee's Br. 43. It argues that, if Appellants' claim can proceed, *any* law that prevents a property owner from immediately effecting an eviction will constitute a physical taking, since it will have "temporarily interfer[ed] with the purported 'right to exclude.'" *See id.* at 43–44.

We take the government's point, but its concern is ultimately misplaced. Initially, what we have here is hardly a run-of-the-mill law implicating the landlord-tenant relationship. Instead, it is a highly unusual—and, so far as the parties have shown, unprecedented—Order that outright prevented evictions for nonpayment of rent. *Cf. Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 552 (2d Cir. 2023) ("It is well settled that limitations on the termination of a tenancy do not effect a [physical] taking *so long as there is a possible route to an eviction*." (emphasis added)), *cert. denied*, 144 S. Ct. 264 (2023).

Further, just because other means might have had a similar economic impact on Appellants—e.g., government action making it more onerous or time-consuming to realize an eviction—it does not follow that such means would give rise to a physical taking. The Supreme Court

considered a similar situation in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015). There, a federal order required raisin growers to give a percentage of their crop to the government. *Id.* at 355. The Court held that this requirement was a physical taking. *Id.* at 361. Although it acknowledged that the government could have simply prohibited the sale of raisins (or limited their production) without effecting a physical taking, the Court concluded that this distinction "flow[ed] naturally" from the "settled difference in [its] takings jurisprudence between appropriation and regulation." *Id.* at 362. It explained:

> A physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower. The Constitution, however, is concerned with means as well as ends. . . . As Justice Holmes noted, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way."

*Id.* (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922)). A similar explanation suffices here. Whatever might be said of other means to achieving the same or a similar end as the Order—and to be clear, we do not pass on any such means—we conclude that Appellants' complaint stated a claim that fits within the Court's conception of a physical taking.

## CONCLUSION

We have considered the government's remaining arguments and find them unpersuasive. For the foregoing reasons, we reverse the Court of Federal Claims' dismissal and remand for further proceedings.

## REVERSED AND REMANDED

### COSTS

Costs to Appellants.

# United States Court of Appeals
# for the Federal Circuit

---

**DARBY DEVELOPMENT COMPANY, INC., ET AL.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-1929

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01621-AOB, Judge Armando O. Bonilla.

---

DYK, *Circuit Judge*, dissenting.

For well over 100 years the Supreme Court has recognized that unauthorized actions of a federal agency or federal official cannot create takings liability. If a government agent exceeds the authority conferred by the statute which grants it the power to act, then that action is unauthorized. Unauthorized actions are distinct from unlawful actions. The pertinent difference is that a government action which is unlawful because it violates some other statute or misinterprets the facts can still be authorized. The majority fails to recognize this critical distinction.

1. Until now our court and our predecessor court have faithfully followed that Supreme Court authority. However, the panel majority here, relying on a misreading of our decision in *Del-Rio Drilling Programs, Inc. v. United*

*States*, 146 F.3d 1358 (Fed. Cir. 1998), rejects established precedent and concludes that "an action can be authorized" even if it is "done without legal authority," Maj. Op. 9, and that "the question of authority for takings-claim purposes is different from the question of statutory authority," Maj. Op. 25. That is, an agency may be authorized if it exceeds the scope of the statute which empowers it to act—so long as the action is within the "normal scope of the government agent's duties." Maj. Op. 16. This approach is unsupported. *Del-Rio* held that an action may be authorized if it is within the normal scope of duties, even if it turns out to be illegal or improper for a separate reason (for example, violating another statute or erroneously determining the facts). *Del-Rio* does not hold that the action can be authorized if it exceeds statutory authority under which the agency or official operates. Nor could it have done so, given that the Supreme Court and earlier circuit decisions have repeatedly held the opposite. These cases establish that unauthorized acts by government officials cannot be attributed to Congress, which has the sole authority to obligate government funds. *See Hoe v. United States*, 218 U.S. 322, 335 (1910).

2. The Supreme Court cases on which the majority relies—*Great Falls Manufacturing Co. v. Garland*, 124 U.S. 581 (1888) and *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922)—either specifically found authorization (*Great Falls*) or ordered the very inquiry into authorization that the governing cases clearly require (*Portsmouth*). There is not a single Supreme Court case that applies the majority's "normal scope of duties" standard. Whatever interpretation is given to the language of *Del-Rio*, the fact remains that not a single case from the Supreme Court or our court has ever imposed takings liability where the agency acted beyond the scope of statutory authorization.

3. Even if the majority's reading of *Del-Rio* were correct, the majority's conclusion that the Centers for Disease

Control and Prevention's ("CDC") eviction moratorium was within the "normal scope" of the duties of the CDC acting under section 361 of the Public Health Service Act ("PHSA"), Maj. Op. 17, is unsupported and inconsistent with the Supreme Court's decision in *Alabama Association of Realtors v. Department of Health & Human Services*, 594 U.S. 758 (2021) (hereinafter "*Alabama Realtors*"). There, the Supreme Court held that the eviction moratorium at issue here was well outside the CDC's normal scope of duties. "This claim of expansive authority under § 361(a) is unprecedented." *Alabama Realtors*, 594 U.S. at 765. The Court concluded that it was "virtually certain . . . that the CDC has exceeded its authority" in adopting an eviction moratorium—"[i]t strains credulity to believe that [the PHSA] grants the CDC the sweeping authority that it asserts." *Id.* at 759–60. "Section 361(a) is a wafer-thin reed on which to rest such sweeping power," *id.* at 765, and "it is a stretch to maintain that § 361(a) gives the CDC the authority to impose this eviction moratorium," *id.* at 764.

4. The majority's holding here would have significant consequences. It would effectively make even clearly unauthorized agency action authorized for purposes of takings liability unless that action was contrary to a specific prohibition of the authorizing statute or taken in bad faith. That cannot be correct. The majority's decision would work a sea change in our takings jurisprudence and impose significant takings liability on agencies for unauthorized acts, directly discouraging adoption of legitimate government programs because of the risk of takings liability in addition to injunctive and declaratory relief. Historically, unauthorized programs were enjoined. Now, in addition there is the specter of takings liability. In this case alone, the Supreme Court found that Congress' "nearly $50 billion in emergency rental assistance" was "a reasonable proxy of

the moratorium's economic impact." *Alabama Realtors*, 594 U.S. at 764.[1]

5. The majority contends that "[d]epriving property owners of a potential Fifth Amendment remedy in this case would deprive them of any meaningful remedy at all." Maj. Op. 26. This is simply incorrect. The appellants here did have a meaningful remedy, which has been repeatedly recognized by the Supreme Court and this court and led to the invalidation of the eviction moratorium order. "Ordinarily, whenever there is no authority for a taking or intrusion, the claimant, although unable to obtain compensation, can seek an injunction or a declaratory judgment against the unauthorized governmental activities." *S. Cal. Fin. Corp. v. United States*, 634 F.2d 521, 526 n.8 (Ct. Cl. 1980); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) ("The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of [an injunction].").

Here, however, the plaintiffs never even bothered to seek an injunction. The CDC's eviction moratorium was first implemented on September 4, 2020, and the plaintiffs could have immediately sought an injunction or declaratory relief. Instead, the plaintiffs did not seek an injunction or declaratory relief and waited nearly a year, until July 27, 2021, to file suit in the Court of Federal Claims alleging a takings claim. Plaintiffs cannot fail to seek an injunction or declaratory relief, wait for damages to accrue,

---

[1]    Other sources have similarly estimated that the amount of back rent, utilities, and late fees owed as of January 2021 would be $57 billion. Jim Parrott & Mark Zandi, *Averting an Eviction Crisis* 2 (Urb. Inst. 2021), https://www.urban.org/sites/default/files/publication/103532/averting-an-eviction-crisis.pdf.

and then contend that only a takings claim is a meaningful remedy.

## I

I now explain how fundamentally the majority has gone astray. The length of this dissent is testament to the large number of cases in the Supreme Court, our court, and our predecessor court that directly contradict the majority's approach.

## A

The requirement that there can be no taking in the absence of authority (and the reason for that requirement) has been recognized repeatedly by the Supreme Court. There can be no takings liability for unauthorized acts because they are not chargeable to the United States.

In 1910 in the seminal *Hooe* case, the Court explained:

It is the Constitution which places these matters under the control of Congress. If an officer of the United States assumes, by virtue alone of his office, and without the authority of Congress, to take such matters under his control, he will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of the Congress, cannot create a claim against the government . . . . The constitutional prohibition against taking private property for public use without just compensation is directed against the government, and not against individual or public officers proceeding without the authority of legislative enactment. The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government.

*Hooe*, 218 U.S. at 335–36 (emphasis omitted). Similarly, in the *Regional Rail Reorganization Act Cases*:

> "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government," and hence recovery is not available in the Court of Claims.

419 U.S. 102, 127 n.16 (1974) (quoting *Hooe*, 218 U.S. at 336).

The Supreme Court decisions applying these principles are legion. The first mention of the authorization requirement appears in *United States v. Great Falls Manufacturing Co.*, 112 U.S. 645, 656 (1884). The Court found that the Secretary of the Interior was authorized to take the land because it was acquired "under the sanction of legislative enactments by Congress" which "appropriate[ed] [] money specifically for the construction of the dam." *Id.* The taking was authorized by the statute and not unlawful, but the failure to pay compensation was unlawful.

In *Hooe*, the Court for the first time found that a lack of authorization defeated a takings claim. The Secretary of the Interior rented a building for an amount in excess of the amount appropriated by Congress. 218 U.S. at 328. The Court held that "[t]he statutes . . . make it plain that the Secretary was without power to make any express contract for rent in excess of the appropriation made by Congress," and thus there was no takings liability. *Id.* at 333.

In *North American Transportation & Trading Co. v. United States*, 253 U.S. 330, 334 (1920), a decade after *Hooe*, the Supreme Court held there was no taking when an Army General appropriated land as a site for an army post. The General took the land pursuant to a statute which provided:

> [T]he Secretary of War may cause proceedings to
> be instituted, in the name of the United States . . .
> for the acquirement, by condemnation, of any land,
> or right pertaining thereto, needed for the site, lo-
> cation, construction, or prosecution of works for for-
> tifications and coast defenses . . . .

Act of Aug. 18, 1890, ch. 797, 26 Stat. 315, 316.  The Su-
preme Court construed the statute to mean that only the
Secretary of War had that authority. *N. Am. Transp.*, 253
U.S. at 333.  Because the General exceeded the scope of
statutory authority, his action was "without authority" for
takings purposes. *Id.* at 334.  The Supreme Court found
that "although Congress may have conferred upon the Ex-
ecutive Department power to take land for a given purpose,
the [g]overnment will not be deemed to have so appropri-
ated private property, merely because some officer thereaf-
ter takes possession of it with a view to effectuating the
general purpose of Congress." *Id.* at 333.

Two years later in *Portsmouth Harbor Land & Hotel
Co. v. United States*, a taking was alleged to have occurred
when a military base fired gun projectiles over the plain-
tiff's property. 260 U.S. 327, 329 (1922).  There was a ques-
tion of whether firing the guns was authorized, and the
Supreme Court remanded to determine whether the ac-
tions were authorized. *Id.* at 330.  The Court concluded
that "[i]t very well may be that the claimants will be unable
to establish authority on the part of those who did the acts
to bind the [g]overnment" and then cited *North American
Transportation*, discussed earlier, making clear once again
that statutory authorization was essential to succeed on a
takings claim. *Id.*

In *Mitchell v. United States*, 267 U.S. 341, 343 (1925),
land was taken by the President for military purposes, in-
cluding the plaintiff's land which was alleged to be "espe-
cially adapted to the growing of [a] particular quality of
corn."  Because "[p]laintiffs were consequently unable to re-

establish themselves elsewhere," they claimed a taking of their business. *Id.* The Court held there was no taking because, among other reasons, "the Act did not confer authority to take a business." *Id.* at 345. "The Act authorized the taking only of 'land and appurtenances and improvements attached thereto,'" and "it did not declare that compensation should be made for losses resulting from the establishment of the [military] ground." *Id.* at 344 (quoting Act of Oct. 6, 1917, ch. 79, 40 Stat. 345, 353). "In the absence of authority, even an intentional taking cannot support an action for compensation under the Tucker Act." *Id.* at 345.

In *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 19 (1940), a taking was alleged when the government constructed dikes which caused part of the plaintiff's land to wash away. The Supreme Court held that the construction of the dikes was authorized, and the government would incur takings liability "if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress." *Id.* at 20–21.

In *Youngstown Sheet & Tube Co. v. Sawyer*, the Court reasoned that Congress had not authorized the President's action in seizing steel mills. An injunction was appropriate because of prospective irreparable injury. The injury was irreparable in part because a right to after-the-fact takings liability had not been established. "Prior cases in this Court have cast doubt on the right to recover in the Court of Claims on account of properties unlawfully taken by government officials for public use." 343 U.S. 579, 585 (1952) (first citing *Hooe*, 218 U.S. at 335–36; and then citing *N. Am. Transp.*, 253 U.S. at 333).[2]

---

[2]    *See also Larson*, 337 U.S. at 701 n.24 ("[W]here a suit is brought against the United States, in which it is

In *Malone v. Bowdoin*, the plaintiff alleged that a Forest Service officer's occupation of land was unauthorized because the plaintiff was the rightful owner of the land. 369 U.S. 643, 644 (1962). The Supreme Court explained that a takings claim could lie because the Forest Service officer was authorized in occupying land; "it [had not] been asserted that the [officer] was exceeding his delegated powers as an officer of the United States in occupying the land in question, or that he was in possession of the land in anything other than his official capacity." *Id.* at 648 (footnote omitted).

Similarly in the *Regional Rail Reorganization Act Cases*, the Court found takings liability because the government's actions were authorized. The government required the transfer of the property of eight major railroads into a single for-profit corporation. 419 U.S. at 108–09. The Court noted that "'[t]he taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the [g]overnment,' and hence recovery is not available in the Court of Claims." *Id.* at 127 n.16 (quoting *Hooe*, 218 U.S. at 336). However, the Court concluded that "[t]hese cases are inapposite since the [g]overnment actions at issue here are authorized by the Rail Act." *Id.*

———————————

claimed that the tortious actions of public officers, within the scope of their delegated powers, *are* the actions of the United States . . . *Portsmouth* . . . demonstrates that such suits cannot be defeated by arguing that the officers' actions, because tortious, are outside of their authority and hence not actions of the United States.") (citation omitted); *id.* at 702 (government action is unauthorized when "it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void").

Thus, the Supreme Court has repeatedly recognized that for a taking to lie, the government agent must have statutory authority. If a government agent violates or exceeds the very statute which grants him power to act, then that action is unauthorized. The majority cannot distinguish these cases or explain why they are not contrary to the approach that it adopts.

These cases leave no room for a normal or general scope of duties exception to statutory authorization. They explicitly require authorization, and if "the [a]ct did not confer authority to take . . . [it] cannot support an action for compensation under the Tucker Act." *Mitchell*, 267 U.S. at 345.

## B

The Supreme Court cases relied on by the majority do not support its contention that an action beyond statutory authority can result in takings liability "if it was done by government agents 'within the general scope of their duties.'" Maj. Op. 11 (quoting *Del-Rio*, 146 F.3d at 1362).

The majority points to the second *Great Falls* decision, *Great Falls Manufacturing Co., v. Garland*, 124 U.S. 581 (1888), as demonstrating that "[a]n action will normally be deemed authorized if it was done by government agents 'within the general scope of their duties.'" Maj. Op. 11 (quoting *Del-Rio*, 146 F.3d at 1362). *Great Falls* stands for no such proposition. *Great Falls* involved formal condemnation proceedings—a different context than liability for inverse condemnation, the issue involved here. As with *Great Falls*, many condemnation cases involve arguments that the government was not authorized to condemn land

because it did not follow the requirements set forth in the condemnation statute.[3]

In *Great Falls*, the statute provided that:

The Secretary of War shall cause to be made . . . a like survey and map of the land necessary for a dam . . . and when surveys and maps shall have been made the Secretary of War and the Attorney General of the United States shall proceed to acquire to and for the United States the outstanding title, if any, to said land and water rights . . . by condemnation.

124 U.S. at 585 (first omission in original) (quoting Act of July 15, 1882, ch. 294, 22 Stat. 168). The plaintiff, in seeking to restrain the United States officers from occupying its property, alleged that the survey required by the statute had not been conducted. *Id.* at 588.

The government never argued that takings liability could not lie because the Secretary of War's acts were unauthorized. Instead, the government contended that it complied with the statute and that the condemnation was authorized. Br. of Argument for Appellees at 7, *Great Falls*, 124 U.S. 581. The Supreme Court found that the

---

[3]    *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 417 (1992) (analyzing whether Amtrak was authorized to condemn specific railroad track under a statute which only allowed condemnation of property "required for intercity rail passenger service" (quoting 45 U.S.C. § 562(d) (1988))); *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 115 (1960) (evaluating if the licensee was authorized to condemn Indian land under a statute which permitted condemnation of "lands or property of others necessary to the construction, maintenance, or operation of any" licensed project (quoting 16 U.S.C. § 814)).

Secretary of War's authorization was not limited by the survey, but extended explicitly to "said land," that is, "the land necessary" for a dam. *Great Falls*, 124 U.S. at 596. "[I]f the Secretary of War . . . found it necessary to take . . . lands of the plaintiff for the proposed dam, which happen not to be covered by the survey and map," such an act was nonetheless authorized. *Id.* at 597. The "Secretary of War [] was invested with large discretion in determining what land was actually required to accomplish in the best manner the object Congress had in view." *Id.* "[T]he record disclose[d] nothing showing that [the Secretary of War] ha[d] taken more land than was reasonably necessary for the purposes described in the act of Congress, or that he did not honestly and reasonably exercise the discretion with which he was invested." *Id.* The actions of the Secretary of War were authorized by the statute.[4]

*Great Falls* therefore held that the government properly followed condemnation proceedings, not that the

---

[4]    *See Brooks v. United States*, 39 Ct. Cl. 494, 505 (1904) ("It is not controverted that the Secretary of the Navy was authorized by law to construct the vessels in controversy and to construct them in the most improved way, to do which he was necessarily clothed with large discretion, both as to the materials and methods to be used, as was the Secretary of War in the case of the *Great Falls Manufacturing Co. v. The Attorney-General* (124 U.S., 581) in determining what land should be taken to carry out, in the best manner, the object Congress had in view by the act in that case, though he took lands outside the survey and map which the act directed to be first made showing the lands to be taken.").

government was liable for a taking even though the acts were unauthorized.[5]

So too in *Portsmouth* (also relied on by the majority, Maj. Op. 12), the Supreme Court explicitly reaffirmed that a lack of authorization would defeat takings liability, *see supra* p. 7.

## C

The cases of this court and our predecessor court have never departed from the Supreme Court's authority until now.[6]  We have consistently held that if a government

---

[5]    The Supreme Court also relied on an alternative ground.  It "further said that all such objections [to the accuracy of the survey and effectiveness of the published notice] were waived by the company when, proceeding under the act of 1882, it invoked the jurisdiction of the Court of Claims to give judgment against the United States for such compensation as it was entitled to receive for its land and water rights." *Great Falls*, 124 U.S. at 597.  "The plaintiff, by adopting that mode, has assented to the taking of its property by the [g]overnment for public use, and has agreed to submit the determination of the question of compensation to the tribunal named by Congress." *Id.* at 599.

[6]    *See, e.g.*, *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed. Cir. 2001) ("[A] takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground."); *Del-Rio*, 146 F.3d at 1362 ("A compensable taking arises only if the government action in question is authorized."); *S. Cal. Fin. Corp.*, 634 F.2d at 523 ("[B]efore a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed."); *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Ct. Cl. 1978) ("[A] Tucker

agent exceeds its statutory authority to act, then that act
is unauthorized and there is no takings liability. A detailed
analysis of the cases shows that this was established long
before *Del-Rio* by authority binding on and cited by the *Del-Rio* court.

In *Eyherabide v. United States*, the plaintiffs owned a
ranch surrounded by an aerial gunnery range for the U.S.
Navy. 345 F.2d 565, 567 (Ct. Cl. 1965). A taking was al-
leged to have resulted from the Navy's gunnery practice
and military drills. *Id.* at 568. There was no claim that the
Navy was unauthorized under its own authorizing statute
to conduct gunnery practice. Our predecessor court found
there was a taking because "the naval personnel who
lobbed shells, dropped casings and other objects, and flew
over and near the property" "acted within the general scope
of [their] duties" and "the placement of the warning signs
was also obviously within the local authority of the gun-
nery range." *Id.* at 570. In other words, the U.S. Navy was
authorized to conduct gunnery practice and other military
drills. The court noted that while the actions "may have
been mistaken, imprudent, or wrongful," they were not
"wholly unauthorized." *Id.*

In *Coast Indian Community v. United States*, 550 F.2d
639, 641 (Ct. Cl. 1977), the Bureau of Indian Affairs ("BIA")
was alleged to have taken tribal property when it conveyed
"a right-of-way across [the plaintiff's tribal] reservation" to
a state entity. As to authority, the plaintiff "claimed that
the BIA conveyed the right-of-way pursuant to the author-
ity vested in the Secretary of the Interior by 25 U.S.C. § 323
(1970)." *Id.* at 650. The court found that "[s]ection 323, it
is true, conferred broad powers on the Secretary 'to grant
rights-of-way for all purposes' across Indian lands . . . [b]ut
section 324 of the same title . . . restricted those powers by

---

Act suit does not lie for an executive taking not authorized
by Congress, expressly or by implication.").

requiring that consents of Indian occupants be obtained in certain circumstances before making a conveyance pursuant to section 323." *Id.* The court held that "[t]he BIA violated the restrictions contained in the statute and regulations, for although it was required by them to obtain the consents of a majority of the adult members of the Coast Indian Community before conveying the right-of-way, it failed to do so." *Id.* "In order for a taking to occur by virtue of the act of an agent of the [g]overnment, the agent's act must be accomplished within the scope of his statutory or delegated authority." *Id.* at 649. "The court must therefore conclude that the BIA's conveyance of the right-of-way in the absence of the required consents was an act beyond the authority of the [g]overnment agents involved" and that there was no takings liability. *Id.* at 652.

The next year in *Sun Oil Co. v. United States*, 572 F.2d 786, 793 (Ct. Cl. 1978), the plaintiffs, having leased oil properties from the United States, alleged that the government's "refusal to approve their application to install [a platform]" for oil drilling amounted to a taking of their leasehold rights. The government "granted the lease on the authority of the Outer Continental Shelf Lands Act ["OCSL Act"]." *Id.* at 792. Our predecessor court found that "[t]he only language in the OCSL Act which expressly authorizes the Secretary to take plaintiff's lease rights is to be found . . . in special national emergency or state of war situations." *Id.* at 819. "No such situations are present in this case." *Id.* Thus, the court held "that the Secretary was without authority to take an OCSL Act lessee's leasehold rights" and there was no takings liability. *Id.*

In *NBH Land Co. v. United States*, military officers disseminated a plan to expand a military reservation onto nearby land, decreasing the land value. 576 F.2d 317, 318 (Ct. Cl. 1978). Our predecessor court held that there was no taking because there was no authority. *Id.* at 319. The military officers' actions were unauthorized because "Congress ha[d] never given affirmative support or recognition

of any sort to this project," *id.* at 318, and thus the action was not "expressly authorized or directed by Congress . . . a natural consequence of Congressionally approved measures . . . [or a] good faith implementation of a Congressional Act," *id.* at 319.

In *Southern California Financial Corp. v. United States*, a taking was alleged when the Air Force took an indefinite easement of the plaintiff's land. 634 F.2d at 525. The court held that there was no taking because the taking of an indefinite easement was unauthorized. *Id.* at 524. The court found a "lack of authority for the Air Force, acting by itself, to take a fee or perpetual easement of the value involved here," *id.* at 523, because "it would be an invasion of the letter and spirit of the Military Construction Program and the Military Construction Appropriation Acts," *id.* at 524.

In *Yuba Goldfields, Inc. v. United States*, a property owner sold the United States land but reserved the right to extract metals from the land and sold that right to the plaintiff. 723 F.2d 884, 885 (Fed. Cir. 1983). A taking was alleged because the United States, mistakenly believing that the plaintiff did not own any extraction rights, advised the plaintiff that it must cease any mining. *Id.* at 885–86. The government defended by claiming the prohibition was unauthorized. *Id.* at 890. We held that the government's prohibition of mining was authorized because the Corps were working on the property and regulating it pursuant to the "Marysville project *as authorized by PL 89–789.*" *Id.* at 891. Just because the government was mistaken as to ownership did not mean "all of those government officials were without authorization to assert what they believed were the rights of the United States, to announce an intent to enforce those rights, and to prohibit what they viewed as infringement of those rights." *Id.*

In *Florida Rock Industries, Inc. v. United States*, a taking was alleged when the Army engineers denied a permit

to mine limestone.  791 F.2d 893, 895 (Fed. Cir. 1986).  The Army had determined that the mining would result in pollution of federal waters.  *Id.*  "[T]he Claims Court . . . found as a fact that the proposed limestone mining would not pollute." *Id.* at 898.  We held that if indeed the mining would not result in pollution, "then the Army engineers had no statutory authority to act" and thus their denial of the permit would have been unauthorized and not a taking.  *Id.* at 898–99.  But we ultimately held that the Claims Court's determination that the mining would not pollute was error, and the government's action was therefore authorized.  *Id.* at 905.

These cases, all decided before *Del-Rio*, demonstrate that when a government agent, by some act, exceeds the authority of the very statute which the government claims grants it authority, there is no takings liability.  At the same time, consistent with Supreme Court authority, we have found takings liability when the government act rests on a mistaken factual assumption (e.g., property ownership) or is illegal or wrongful based on violation of some other statute or regulation.

*Del-Rio* itself was about property ownership rather than the scope of legislative authorization.  We held that the Claims Court in takings cases could determine the extent of the claimant's property interest and that the government did not lack authority to deny the permit simply because the government was mistaken as to the extent of the plaintiff's property rights.  *Del-Rio*, 146 F.3d at 1364–65.

The majority fundamentally misunderstands our decision in *Del-Rio*, contending that "even if an action by a government agent is unlawful, it will likely be deemed authorized for takings-claim purposes if it was done within the normal scope of the agent's duties—for example, if it was done 'pursuant to the good faith implementation of a congressional act.'" Maj. Op. 16 (quoting *Del-Rio*, 146 F.3d

at 1362 (cleaned up)).  In *Del-Rio*, the plaintiff claimed that
the United States had taken its property when the Bureau
of Land Management ("BLM") denied the plaintiff a permit
to mine minerals because it lacked a right to access the
property for drilling purposes.  *Del-Rio*, 146 F.3d at 1361.
The plaintiff contended that it in fact had the required
property interest.[7]  Br. for Appellant at 9, *Del-Rio*, 146 F.3d
1358.  The government urged that the plaintiff's claim de-
pended on the existence of an error by the BLM in the per-
mitting process as to property ownership, which amounted
to a claim by the plaintiff that the BLM lacked authority to
deny the permit, and that under the cases described above
there could be no taking.  *Del-Rio*, 146 F.3d at 1361.  The
plaintiff responded that the government action was author-
ized because the government agents were acting pursuant
to the "normal scope of their duties" under the authorizing

---

[7]    The plaintiff had entered into a mineral lease with
the government, allowing it to extract oil and gas on an In-
dian reservation.  In creating the reservation, the govern-
ment became trustee for the Indian Tribe for the surface
rights, but retained the mineral interest.  146 F.3d at 1360.
The lease gave the plaintiff "the right 'to drill for, mine,
extract, remove, and dispose of all the oil and gas deposits
. . . in the lands leased.'"  *Id.*  By regulation "the BLM re-
quired owners of mining leases on federal land to secure
special permits before drilling or surveying on the land cov-
ered by the leases," and to demonstrate that they had ac-
cess rights.  *Id.*  The BLM denied the plaintiff's permit on
the ground that the plaintiff did not have the required ac-
cess rights, holding that those rights had to be secured
from the tribe pursuant to the Tribal Consent Act (25
U.S.C. §§ 323–325 (1994)).  *Id.* at 1360–61.  The plaintiff
maintained that it already had access rights, which it con-
tended had been retained by the government and trans-
ferred to the plaintiff as part of the lease.  *See* Br. for
Appellant at 9, *Del-Rio*, 146 F.3d 1358.

statute in denying the permit.  Br. for Appellant at 23, *Del-Rio*, 146 F.3d 1358.  Determining property ownership was within the normal scope of the agent's duties.  We agreed that a government official's actions, though unlawful because violative of another statute or mistaken on the facts, may create takings liability if the action is within the "normal scope" of that official's duties.  *Del-Rio*, 146 F.3d at 1362 (quoting *Ramirez v. Weinberger*, 724 F.2d 143, 151 (D.C. Cir. 1983), *rev'd*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), *vacated on other grounds*, 471 U.S. 1113 (1985)).

In that connection, we held that the Court of Federal Claims could resolve the question of property ownership in adjudicating the takings claim.  *Del-Rio*, 146 F.3d at 1367.  There was no lack of regulatory authority since the BLM clearly had authority to engage in the permitting process.  *See* 30 U.S.C. §§ 189, 226(a) (1994); *Del-Rio*, 146 F.3d at 1363 ("It was part of [the Interior Department officials'] job to interpret the statutes and regulations governing federal mineral leases . . . .").  Nor did the government on appeal even argue that the permit denial was unauthorized.  Quite the contrary, both parties argued that the action was authorized.  Br. for Appellee at 6, 7, 11, *Del-Rio*, 146 F.3d 1358; Br. for Appellant at 6, *Del-Rio*, 146 F.3d 1358.  An alleged mistake of fact as to access rights by the BLM did not render the government action unauthorized or prevent the Court of Federal Claims from considering the takings claim and determining whether access rights existed.

We distinguished cases such as *Florida Rock* where it was alleged that there was a lack of statutory authority.  We quoted approvingly *Florida Rock*'s statement that "[i]n defending, the government may deny the authority and in that way authority could become an issue in a Tucker Act taking case."  *Del-Rio*, 146 F.3d at 1365 (quoting 791 F.2d at 899).  We confirmed that "[t]he court's focus in *Florida Rock* was thus on the issue of authorization, and the court properly held that a plaintiff in a Tucker Act suit cannot

obtain relief if the government officials in question were acting without authorization." *Id.*

We explained that "government agents have the requisite authorization if they act within the general scope of their duties, *i.e.*, if their actions are a 'natural consequence of Congressionally approved measures,' or are pursuant to 'the good faith implementation of a Congressional Act.'" 146 F.3d at 1362 (first quoting *NBH Land Co.*, 576 F.2d at 319; and then quoting *S. Cal. Fin. Corp.*, 634 F.2d at 525). But, we held that an agent's act was unauthorized if "the conduct was *ultra vires*, *i.e.*, it was either explicitly prohibited or was outside the normal scope of the government officials' duties." *Id.* at 1363. In *Del-Rio*, on no fewer than five occasions, we treated ultra vires action as defeating authority for takings purposes.[8] An agency's ultra vires

---

[8]    1. "The first [question] is whether the government conduct at issue was 'authorized,' *i.e.*, whether the alleged invasion of property rights is chargeable to the government or is an act committed by a government agent acting *ultra vires*." *Del-Rio*, 146 F.3d at 1362.

2. "[W]hen a government official engages in *ultra vires* conduct, the official 'will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government "founded upon the Constitution."'" *Id.* (quoting *Hooe*, 218 U.S. at 335).

3. "In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is 'unauthorized' and conduct that is authorized but nonetheless unlawful." *Id.*

4. "While this court has on occasion referred to 'invalid' or 'illegal' government conduct as 'unauthorized' . . . we

actions are those taken without statutory authority. *Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) ("Both [an agency's] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires.").

The reference to "normal scope of duties" does not suggest that statutory authorization is unnecessary but simply responds to the Claims Court's holding that "[o]nly if the action is 'valid,' i.e., unassailable on some independent constitutional, statutory, or procedural ground, should the Takings Clause be implicated," *Del-Rio*, 37 Fed. Cl. 157, 161 (1997), *rev'd*, 146 F.3d 1358, and to make clear that issues of fact as to property ownership do not equate to a lack of authorization.[9]

The majority in *Del-Rio* relied on the D.C. Circuit's vacated opinion in *Ramirez*, another case involving a dispute as to property ownership. There, the Department of Defense occupied land, allegedly owned by plaintiff, for use as a training facility for Salvadoran soldiers, apparently unaware of the plaintiff's ownership. *Ramirez*, 724 F.2d at 145. The occupation was alleged to be illegal because the

---

understand those references to require a showing that the conduct was *ultra vires . . . .*" *Id.* at 1363.

5. "[T]he plaintiff in a takings action cannot assert that the government conduct was unauthorized, since conduct by a government official who is acting *ultra vires* cannot effect a governmental taking for public purposes within the meaning of the Fifth Amendment." *Id.* at 1365.

[9]    "The cases cited by the government do not stand for the proposition that the Court of Federal Claims loses jurisdiction to decide a takings claim whenever the government seeks to defend the agency action on the ground that the plaintiff lacks the property right on which its takings claim is based." *Del-Rio*, 146 F.3d at 1365.

government appropriated land belonging to the plaintiff without compensation. *Id.* at 146. The government did not violate the statute under which it was operating, a statute that granted it authority to set up military training facilities. *Id.* at 153. Instead, the government made a simple mistake as to who owned the land. The occupation of the land was nonetheless held to be authorized for purposes of takings liability. *Id.* The court made it clear that "the mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes," and precluding takings liability based solely on the government action turning out to be illegal would be "an extreme position." *Id.* at 151. The court found authorization specifically because "the officials of the Defense Department in the present case were performing their ordinary responsibilities of deploying United States military forces and of planning and operating a training facility for the military forces of a friendly country." *Id.* at 153. Nothing in *Ramirez* says a takings claim can be based on government acts which lack statutory authority.[10]

---

10   The majority also points to *Ramirez* as suggesting the relevance of agency law and to the Restatement of Agency for the proposition that "it is not novel to define the agent's authority based on its reasonable (even if ultimately mistaken) understanding of the authority that the principal gave it." Maj. Op. 11 n.7. However, *Ramirez* itself recognizes that authority in the takings context is "not as liberal as[] the 'scope of employment' test for application of the doctrine of *respondeat superior* in private law." *Ramirez*, 724 F.2d at 151. And, unlike the law of agency, a federal agency cannot acquire authority by reasonably believing that it has such authority. Indeed, the Supreme Court has rejected exactly that proposition. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2262

Our cases after *Del-Rio* confirm that statutory authorization is required. In *Rith Energy, Inc. v. United States*, an office of the Department of the Interior ("OSM") leased mining rights to the plaintiff. 247 F.3d 1355, 1358 (Fed. Cir. 2001). The government "suspended [the plaintiff's] permit and prohibited it from mining most of the coal covered by the mining leases." *Id.* The plaintiff claimed the suspension of its permit was a taking. *Id.* The Surface Mining Control and Reclamation Act of 1977 "authorizes the Department of the Interior to prohibit mining operations that create an imminent danger to the health and safety of the public or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources." *Id.* at 1358–59 (citing 30 U.S.C. § 1271). We found "that if OSM had failed to act, there was a high probability that acid mine drainage would have occurred, severely polluting the Sewanee Conglomerate and endangering domestic and public water supplies." *Id.* at 1365. Thus, we held that "a takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground." *Id.*

Later cases are to the same effect. In *Taylor v. United States*, 959 F.3d 1081, 1089 (Fed. Cir. 2020), we found that "[t]he [plaintiffs] cannot deny that the action was within the 'authority' of those who took it; such a denial would defeat their taking claim." In *Lion Raisins, Inc. v. United States*, we once again recognized that "in a takings case we assume that the underlying governmental action was lawful [under the statute]." 416 F.3d 1356, 1370 (Fed. Cir. 2005) (quoting *Rith*, 270 F.3d 1347, 1352 (Fed. Cir. 2001)); *see also Washington Federal v. United States*, 26 F.4th

---

(2024) (explaining that it is up to the reviewing court to decide "whether the statute at issue delegates particular discretionary authority to an agency").

1253, 1264 (Fed. Cir. 2022).  Our post-*Del-Rio* cases thus have consistently held that authority is essential to a takings claim and takings liability cannot be founded upon a lack of authorization.[11]

The majority's decision is inconsistent with cases such as *Hooe*, *North American Transportation*, *Mitchell*, *Southern California Financial*, *Coast Indian Community*, *Sun Oil Co.*, and *NBH Land Co.*, where takings liability was

---

[11]  Our nonprecedential decisions after *Del-Rio* have likewise held that authorization is required for takings liability.  In *Filler v. United States*, the plaintiff claimed that an online post by a government agent, employed by the National Marine Fisheries Service ("NMFS"), regarding a medical procedure, was an authorized government act that resulted in a taking of the plaintiff's medical license.  602 F. App'x 518, 519–20 (Fed. Cir. 2015) (non-precedential).  We held there was no taking because the "NMFS does not have the statutory authority to regulate medical practices or drug safety."  *Id.* at 521.  Because there was no statutory authority, there was no taking.

In *Canuto v. United States*, we found no taking.  651 F. App'x 996, 998 (Fed. Cir. 2016) (non-precedential).  The plaintiff alleged "that on several occasions, members of the United States military" assaulted her and her family and took her property.  *Id.* at 997.  We found that "[the plaintiff] does not allege any facts that can plausibly be taken to show that the government agents, members of the military, were acting in an authorized manner in the conduct she alleges" because "[s]he has not, for instance, identified a law-enforcement initiative, an investigation, a military operation, or a statutory mandate that might have led government agents to commit the acts she alleges."  *Id.* at 998.

rejected because of a lack of authorization, and inconsistent with cases finding takings liability only because there was statutory authorization for the government's action.

Finally, to the extent that the majority suggests that a directive from the President could make the CDC's action authorized, *see* Maj. Op. 20, it is inconsistent with Supreme Court precedent. "In order that the [g]overnment shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power." *N. Am. Transp.*, 253 U.S. at 333. Presidential action is not a substitute for Congressional authorization. Congress "can authorize the taking of private property for public use" and "[t]he Constitution does not subject this law-making power of Congress to presidential . . . control." *Youngstown*, 343 U.S. at 588. "[T]he President may not exercise the legislative power to authorize the seizure of private property for public use." *Clinton v. Jones*, 520 U.S. 681, 700 (1997).

## II

The Supreme Court and circuit authority is clear. But let us assume for the moment that the majority, contrary to all authority, is correct as to the legal standard. Even if the majority's statement of the law were correct, and that a government official's action could be authorized if it fell within that official's "normal scope of duties," even though beyond the official's authority under the statute, the CDC issuing an eviction moratorium cannot plausibly be said to be within the CDC's normal scope of duties.

First, the history and language of the statute (section 361 of the PHSA) demonstrates that the primary concern was with quarantine and inspection and that Congress did not contemplate measures such as eviction moratoriums. Section 361, first enacted in 1944, was designed to accumulate past legislative authorities. That authority was limited.

Health regulation designed to avoid the spread of pandemics began in the 17th century with local and state regulation of vessels arriving from foreign ports. The federal government became involved at the end of the 18th century, and in 1796 Congress for the first time passed a law which authorized the President to assist states in quarantine measures. An Act Relative to Quarantine, ch. 31, 1 Stat. 474 (1796) (repealed 1799). In 1878 Congress passed a law which empowered the Surgeon General to implement quarantine regulations to prevent the introduction of contagious or infectious diseases into the United States, which included requiring vessels to report infections onboard. Act of Apr. 29, 1878, ch. 66, §§ 2, 5, 20 Stat. 37–38. In 1893, Congress expanded federal quarantine powers by enacting a law which regulated how and when foreign vessels could unload cargo and passengers, including enabling the Secretary of the Treasury to place infected vessels in federal quarantine stations. Act of Feb. 15, 1893, ch. 114, § 6, 27 Stat. 449, 452. The new law also authorized the President to halt immigration from specific countries which posed a "serious danger of the introduction of [cholera or other infectious or contagious diseases] into the United States." *Id.* § 7.

The PHSA was enacted "to bring together into a single and consistent enactment virtually all of the statutes relating to the [Public Health] Service—a body of law which had accumulated over a century and a half." Alanson W. Willcox, *The Public Health Service Act, 1944*, 7 Soc. Sec. Bull. 15, 15 (1944).[12]

---

[12] Since its enactment in 1944, Congress has only substantively amended the provision once, in 2002, as part of the Public Health Security and Bioterrorism Preparedness and Response Act. The amendment expanded the Health and Human Services ("HHS") Secretary's authority

Section 361 of the PHSA was evidently primarily intended to allow the federal government to inspect and quarantine articles, animals, or individuals that were infected or diseased. The legislative history describes the purpose of section 361 of the PHSA only in terms of quarantine and inspections. *See* Hearing Before a Subcomm. on Interstate & Foreign Commerce on H.R. 3379: A Bill to Codify the Laws Relating to the Public Health Service, and for Other Purposes, 78th Cong. 138–39 (1944) (statement of Mr. Wilcox).

The text of the statute confirms this primary purpose. Section 361(a) provides for the adoption of "regulations . . . for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings." 42 U.S.C. § 264(a).[13] Section (b) provides for the limited regulation of "apprehension, detention, or conditional release of individuals . . . for the purpose of preventing the introduction, transmission, or spread of [] communicable diseases." *Id.* § 264(b). On its face, though the statute provides for such "other measures, as in [the Surgeon General's] judgment may be

---

by eliminating a provision that only allowed the Secretary to issue quarantine rules if they were recommended by the National Advisory Health Council and to allow interstate quarantine of individuals who were reasonably believed to be in the pre-communicable stage of an infectious disease if the disease "would be likely to cause a public health emergency if transmitted to other individuals." Public Health Security and Bioterrorism Preparedness and Response Act of 2002, Pub. L. No. 107-188, § 142(b)(2)(B), 116 Stat. 626–27.

[13] As the majority recognizes, the PHSA names the Surgeon General, but this authority has been transferred to the CDC. *See* Maj. Op. 17 n.12.

necessary" "to prevent the introduction, transmission, or spread of communicable diseases," the statute is concerned with preventing the interstate movement of "infected or contaminated" articles or persons. *Id.* § 264(a). The CDC's order is unlike any of the specific examples of permitted agency action in the text of the statute, the examples referenced in the legislative history, or past practices under predecessor statutes. It is not an action within the CDC's normal scope of duties.

Second, the statute had been in existence for 76 years, but the CDC's eviction moratorium order was unlike any previous action taken under the PHSA before the COVID-19 pandemic. "Prior to the COVID-19 pandemic, agencies that were delegated authority under Section 361 generally invoked the provision to issue regulations related to the quarantine and isolation of individuals believed to have been infected or exposed to a contagious disease, as well as the control or treatment of areas, animals, or articles that were susceptible or subject to contamination or infection." WEN W. SHEN, CONGRESSIONAL RESEARCH SERVICE, SCOPE OF CDC AUTHORITY UNDER SECTION 361 OF THE PUBLIC HEALTH SERVICE ACT (PHSA) 11 (2021) (footnotes omitted). Specifically, "[u]ntil the COVID-19 pandemic, the CDC primarily invoked its [s]ection 361 authority to issue and refine regulations relating to quarantine and isolation." *Id.* at 12.

The CDC's eviction moratorium is more like prior state eviction moratoriums designed to mitigate the economic effects of a pandemic than a public health measure designed to prevent the spread of disease.[14] President Biden indeed

---

[14] Many states enacted eviction moratoriums aimed at addressing the economic effects of the pandemic. *See, e.g.*, *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 376 (D. Mass. 2020) ("The House Speaker said, 'We acted to

justified the CDC's eviction moratorium in part because "it will probably give some additional time while we're getting that $45 billion out to people who are, in fact, behind in the rent and don't have the money." The White House, Remarks by President Biden on Fighting the COVID-19 Pandemic (Aug. 3, 2021). Economic regulations are plainly not within the CDC's normal scope of duties.

The Supreme Court in *Alabama Realtors* confirmed that the statute "ha[d] rarely been invoked—and never before to justify an eviction moratorium. Regulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease." 594 U.S. at 761.[15] It is hard to understand how the majority here can conclude

---

safeguard tenants and homeowners from economic insecurity during and for a period after the state of emergency ends."); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 155 (S.D.N.Y. 2020) ("The New York State Legislature and the Governor, Defendant Andrew Cuomo, have worked together to respond to this evolving crisis and its effects on the health, safety, and economic wellbeing of New Yorkers."). The CDC's Order likewise addresses "housing stability" and prevents landlords from evicting tenants who are unable to pay their rent. Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292.

[15]   Likewise, in granting summary judgment that the eviction moratorium exceeded the CDC's statutory authority, the district court explained that "[i]t is also telling that the CDC has never used [section 361] in this manner. As the [CDC] confirms, [section 361] 'has never been used to implement a temporary eviction moratorium,' and 'has rarely [been] utilized . . . for disease-control purposes.'" *Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 29, 41 (D.D.C. 2021).

that the CDC's actions were within the normal scope of the CDC's duties when the CDC had never used section 361 for anything like an eviction moratorium before.

Third, in defending the CDC's Order before the Supreme Court in *Alabama Realtors*, the government never characterized the order as a routine exercise of authority. Instead, the government explained that the Order "rested on the CDC's findings that the United States faced the risk of an unprecedented wave of evictions" based on "an unprecedented public emergency." Response in Opposition to Applicants' Emergency Application to Vacate the Stay at 16, 34, *Alabama Realtors*. The majority here likewise describes the eviction moratorium as "hardly a run-of-the-mill law implicating the landlord-tenant relationship" and "[i]nstead, it is a highly unusual—and, so far as the parties have shown, unprecedented—Order." Maj. Op. 34. The CDC's Order was a response to an extreme event, and not a routine order issued within the normal scope of its duties.

Fourth, and most significantly, the Supreme Court's decision in *Alabama Realtors* made clear that the CDC's action is far outside any reasonable construction of the statute. In vacating a stay of the injunction barring enforcement of the eviction moratorium, the Supreme Court found "that the applicants are virtually certain to succeed on the merits of their argument that the CDC has exceeded its authority." *Alabama Realtors*, 594 U.S. at 759. In analyzing the likelihood of success on the merits, the Supreme Court did not mince its words. It held that it "strains credulity" that the "decades-old statute that authorizes [the CDC] to implement measures like fumigation and pest extermination" grants CDC the power to impose a nationwide eviction moratorium. *Id.* at 760. The Supreme Court found that "it [wa]s a stretch to maintain that § 361(a) gives the CDC the authority to impose this eviction moratorium." *Id.* at 764. "Indeed, the [g]overnment's read of § 361(a) would give the CDC a breathtaking amount of

authority" and "[s]ection 361(a) is a wafer-thin reed on which to rest such sweeping power." *Id.* at 764–65.

It cannot be both that the eviction moratorium was within the normal scope of the CDC's duties and that "[t]his claim of expansive authority under § 361(a) is unprecedented." *Id.* at 765. The Supreme Court explained that "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast "economic and political significance."'" *Id.* at 764 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, (2014)). For the CDC to implement eviction moratoriums, which the Supreme Court described as exercising "a breathtaking amount of authority," it would first need explicit Congressional authorization. *Id.* Such clear authorization is missing from the PHSA. In sum, the Supreme Court's decision specifically held that the eviction moratorium was outside the agency's normal scope of duties or any reasonable interpretation of its powers.

Thus, even under the majority's expressed view of *Del-Rio*, the CDC's eviction moratorium was not within the normal scope of its duties under the PHSA and thus the CDC's action was unauthorized. A takings claim cannot lie for such unauthorized acts of a government official.

As discussed earlier, the majority's mistake will have significant consequences for future cases. It will impose potential takings liability on agencies for virtually any act that is not contrary to a specific statutory prohibition or taken in bad faith. The increased risk of takings liability will deter government programs, and the government in this case alone has potential liability upwards of $50 billion. This major change to our takings jurisprudence is

without support and cannot be correct.  I respectfully dissent.[16]

---

[16]    Since the takings claim must be rejected for lack of authority, I do not reach the physical takings issue.